# Reading and Columbia R. R. Co. *versus* Ritchie et al.

| 102 | 425 |
|-----|-----|
| 153 | 424 |
| 102 | 425 |
| 176 | 33 |

| 102 | 425 |
|-----|-----|
| 20 SC | 1627 |

| 102 | 425 |
|-----|-----|
| 206 | 0533 |

| 102 | 425 |
|-----|-----|
| 218 | 196 |

| 102 | 425 |
|-----|-----|
| 223 | 6 28 |

1. In an action to recover damages for alleged negligence, if the undisputed evidence discloses no negligence on the part of the defendant, it is error for the court to submit it to the jury as an open question.

2. Where there is affirmative and uncontradicted evidence of contributory negligence, by the plaintiff, the court should instruct the jury, that if they believe the witness, their verdict must be for the defendant.

3. It is error to submit to the jury as a possible element in the cause a supposititious case of which there is no evidence.

4. Failure on the part of a traveller crossing a railroad track at grade to stop, look and listen is not merely evidence of negligence, but negligence per se and a question for the court. Penn. R. R. Co. *v.* Beale, 23 P. F. S. 509, followed.

5. Where there is no direct evidence that the traveller did not stop, look and listen, the presumption of law that he performed his full duty will prevail; but where there is direct, affirmative and credible evidence to the contrary, the presumption of law is rebutted and will give way to the actual truth.

6. It is not negligence for a railroad company to run its trains over a public crossing in the open country at the rate of thirty miles an hour. It is only the force of special circumstances that requires a less rate of speed.

7. A. was killed by a railroad train at a public crossing, which was about nine hundred and fifty feet below a station. The train was not visible to one approaching the crossing by the public road until within twelve or fifteen feet of the rails, where the view was unobstructed to the station. When the train was in a cut, which hid it from view, some eighteen hundred feet from the scene of the accident, it blew a long, loud whistle. Upon coming within sight of the station, and seeing no signal to stop, it being a flag station, the engineer again whistled twice. These whistles were heard by various witnesses, two of whom were over one thousand feet beyond the crossing in question. The train passed the crossing at a rate of speed between twenty-five and thirty miles an hour, and struck and instantly killed A., who was driving in a closed carriage on account of rain. A. was last seen by one of defendant's witnesses, who testified that he did not stop as long as he (the witness) could see him, and that his disappearance from view was almost simultaneous with the collision. In a suit by the widow and minor children to recover damages for his death, *Held*, that as there was no proof of negligence on the part of the defendant, and as there was affirmative, uncontradicted and unimpeached testimony showing contributory negligence on the part of the deceased, the court should have given the jury binding instructions in favor of the defendant.

February 27th 1883. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

[Reading, &c. R. R. Co *v.* Ritchie.]

ERROR to the Court of Common Pleas of *Berks county:* Of January Term 1882, No. 11.

Case, by Eliza Ritchie and others, widow and minor children of William Ritchie, deceased, against the Reading and Columbia Railroad Company, to recover damages for the death of said William Ritchie, caused by the alleged negligence of defendant's servants. Plea, not guilty.

On the trial, before SASSAMAN, J., the evidence was substantially as follows :—On May 31st 1878, the said William Ritchie was killed by a passing train, while attempting to cross the tracks of defendant company in a covered carriage. The place of the accident was a public crossing nine hundred and forty six feet east of the Fritztown station and towards the city of Reading. This station is a flag station, i. e. one at which trains do not stop for freight or passengers unless especially signalled. West of the station is a deep cut beginning some three hundreed to four hundred yards from the station and completely obscuring trains from view by its high embankments. At or near the crossing, upon which the accident occurred, there is also a shallow cut from ten to eleven feet deep. The nearest building to the crossing is three hundred yards distant. The village of Fritztown, the nearest aggregation of buildings, is a half a mile from the scene of the accident. The rules of the company required two long and two short whistles to be sounded, as a signal for road crossings. Engineers are also instructed not to run their trains faster than six miles an hour over certain specified crossings, but it appeared in evidence that this regulation did not apply to the crossing in question.

The train in question was running eastwardly from Lancaster to Reading at a rate of speed estimated at between twenty-five and thirty miles an hour. Before entering the deep cut and about six hundred to eight hundred yards from the station, it made a prolonged whistle, and on emerging from the cut, where the station could be first seen, and perceiving no signal to stop, it blew two short additional whistles, as a signal to the brakesman to turn off the brakes. These alarms were heard by various witnesses, at distances from the station, varying from two hundred to six hundred yards, and by two others (Daniel Adams and Isaac Steffy) at a tool-house over one thousand feet beyond the place of the accident in the direction of Reading.

The road, upon which deceased was driving, descends to cross the railway track. It has embankments upon either side which shut out the view along the track until within twelve or fifteen feet from the rails, from which point the Fritztown station can be seen. On each side of the road are caution boards. The deceased was driving in a closed carriage on a rainy day.

The only witness (George Freeman) who saw him immediately before the accident, testified as follows:—

"Q. Did you know William Ritchie? A. Yes, sir. Q. Did you see him on the 31st of May? A. Yes, sir; I saw him drive; I also saw him when he was dead. Q. Do you remember when the train struck him? A. No, sir; I could not see that; the wagon I could not see; the cars were higher than the wagon, and that is the reason I could not see the wagon when it was struck. Q. If you saw him drive down that road, state how he came down and in what way he drove? A. He drove down in a walk. Q. How far from this crossing were you? A. Between five hundred and six hundred yards. Q. How is the ground there on your little place; is it higher or lower? A. It is pretty much higher; I can see the track from the street. Q. When he approached the railroad crossing did he stop his team, or did he go on? A. He did not stop it as far as I could see him. Q. Did you see him coming down the hill? A. Yes, sir. Q. Had you heard the train coming? A. Yes, sir. Q. Where was Ritchie when you first saw him? A. About one hundred yards from the railroad track. Q. Where was he when you last saw him? A. Against the cars: within fifteen or twenty feet; the cars were higher than his wagon, and I could not see the wagon. Q. Up to the time you last saw the wagon did he stop the team at all? A. When I did not see him any more, the not seeing him, and the crash of the accident and the horse running away on the other side, was about one and the same moment. Q. But during the time that you saw him he did not stop? A. No, sir. Q. Did you hear the train whistle on that day? A. Yes, sir."

The train passed the station at the said rate of speed, struck the carriage at the crossing, and instantly killed its occupant.

The defendant presented the following points:

1. That the plaintiff having established that the train whistled in time to give warning to William Ritchie of the approach of the train to the crossing; if he failed for any cause to heed the warning, it was his own misfortune, and there is no evidence of negligence in the cause, and the verdict must be for the defendant.

Answer. We cannot affirm this point in this form. The facts in the case would be for the jury. (First assignment of error.)

2. That running at the rate of 25 or 30 miles an hour, as the train neared the crossing, which was an ordinary country road, was not negligence on the part of the defendant, nor evidence from which the jury can infer negligence.

Answer. Ordinarily this would be true, but the facts of every case must be taken into consideration, and what might be

proper in one place would not be so in another. If the place is particularly dangerous, trains must be run more cautiously. (Second assignment of error.)

5. That under all the evidence in this case the verdict must be for defendant.

Answer. If the jury find that Ritchie was guilty of contributory negligence the verdict must be for the defendant. (Eighth assignment of error.)

The court charged, inter alia, as follows :

" Again, there is also no dispute as to the rules for running trains there. The rules for running the trains at that place are that they should not run by the cut of the South Mountain, and also over the crossings faster than at the rate of six miles an hour. This is a matter of prudent regulation by the management of the railroad, and is founded upon theory and practice to be a correct method for conducting their business. As a matter of law it would amount to nothing. It is an important matter of fact to be taken into consideration by the jury in connection with other facts in disposing of the law upon the facts." (Third assignment of error.)

" Railroad trains by their agents, and also travellers—that is, persons crossing railroads—are bound to use greater care and caution at places that are particularly dangerous—such as running over crossings where the railroad and the public roads, or proper places of crossing, are in deep cuts, or where the railroads run around short curves, where there are high bluffs, and where consequently there is danger of collision or accident. Where such things may be anticipated, or where this would be likely to occur without using special caution, there ordinary care would require just that special caution which the ordinary care at such a place would induce ; and what is ordinary care under one state of circumstances might not be ordinary care under another state of circumstances. But the ordinary care to be exercised by a man, is just that care we have spoken of to you—the care which a man of ordinary intelligence and diligence would use under the circumstances, whether he ran a railroad train or whether he ran a one-horse shay. It would make no difference whether it was the man running the train, or the one crossing the railroad track. At this point it may be very properly said that railroad employees on trains, and the men who are travelling over the point of crossing are in lawful positions, and they must exercise such care—both of them—as we have already stated to you, and the care required of them is mutual, in order that collisions may be avoided. On the one hand a collision may be avoided by the exercise of proper care on the part of the man who crosses the track, so that the persons who are in the train may

not be injured by the obstruction he may place upon it in his crossing ; and on the other hand, the railroad employees are to use that due and proper caution and care, which under the circumstances is required, so as not suddenly and unawares to run upon anybody that is crossing the track. Where there would be an absence of that care on the part of the railroad company —and we have said to you so far as we have gone that the presumption is in favor of the dead man—there a *prima facie* case would be made out for the plaintiff; and in a case like this there might be a recovery of damages, if the jury found that the presumption of ordinary care was sufficient in favor of the man who was killed. If you find the facts to be such as we have supposed them to be in the hypothetical case we argued upon before you, up to this time, taking the views and theories of the plaintiff as correct, there would be damages ; and· if the jury find that there should be a recovery for the loss of such a life, it would be proper for the jury to find that there ·should be damages allowed, because the man had used all the care that was required of him, and the negligence of the occurrence was on the part of the railroad train, which ran faster than under the circumstances it should have run." (Fourth assignment of error.)

" If these whistles were sounded, it would rebut the idea of negligence on the part of the defendant to that extent. If the conformation of the ground, the topography of the immediate place and location would be such that the convolutions of sound in their vibration could be carried over his head, so that he could not be able to hear it from the place in which he was, and it would be carried to persons beyond that, who could hear it, might be no evidence that he heard it ; but if he did not hear it, because he was negligent himself, having been in a closed wagon, having pulled up his coat-collar, or scarf, or whatever he might have worn that was in season—where such things were used over his ears, and he did not hear, for that reason, and he did not remove the obstruction, if in his control, so that he could hear, he would be negligent already ; or if a train would sound a whistle, and having sounded a whistle would nevertheless run at an entirely unusual rate of speed for the place where they passed, whereby such a person had been misled—if the train did not do that, then the· fact of its having sounded a whistle and of its having run at only ordinary rate of speed, would be relief from responsibility ; but if it run at a greater rate of speed than would be usual, ordinary and proper at such a place, taking all things into consideration, then the case might· be different. Or, if by some of the accidents which occur in life, for which we cannot account—although they often occur—this man should have got on the track, and the

engineer, who was in control of the train, should have seen his horse or vehicle on the track, and he should have run on head-long without stopping, when he saw the man, having no opportunity to get out of the way, being in a dangerous situation, or even if in a situation where the danger was so great as to lose his presence of mind, the defendant would not be released from paying damages." (Fifth assignment of error.)

Verdict for the plaintiffs for $5,000, and judgment thereon. The defendant thereupon took this writ of error, assigning for error the action of the court in answering its first, second, and fifth points, the portions of the charge above quoted and generally that "the charge, as a whole, is verbose, confused and unintelligible, instead of being a plain, concise and practical statement of the law applicable to the facts of the case. Its tendency was to mislead and confuse the jury." (Seventh assignment of error.)

*Jeff. Snyder* and *Geo. F. Baer*, for the plaintiff in error.— There was no evidence to warrant the court in submitting the case to the jury. On the contrary, the evidence of plaintiff's witnesses conclusively showed that the company had not been negligent, that it had taken every precaution, and that the deceased had been guilty of contributory negligence. The plaintiffs should have been nonsuited, and undisputed facts should not have been left to a jury as though they were disputed : Baxter *v.* R. R. Co., 41 N. Y. 505 ; Wilcox *v.* R. R. Co., 39 Id. 358 ; Haas *v.* R. R. Co., 8 Am. and Eng. R. R. Cases, 269.

*James N. Ermentrout* (*Daniel Ermentrout* and *Henry C. G. Reber* with him), for defendant in error.—It is not error on the part of the judge presiding at a trial of this kind to decline to select a series of facts possible to exist from the testimony, the same being controverted, and state to the jury as a matter of law, whether such, if found, would or would not constitute negligence. No absolute rule as to what constitutes negligence can be laid down or followed. It is a question for the jury under proper instructions : Pa. R. R. Co. *v.* Goodman, 12 P. F. S. 338 ; R. R. Co. *v.* Hagan, 11 Wr. 244 ; R. R. Co. *v.* Werner, 6 W. N. C. 520. It would have been an invasion of the province of a jury for the court to have withdrawn from their consideration the facts of this case.

Mr. Justice GREEN delivered the opinion of the court, March 19th 1883.

It is difficult to understand upon what theory of the testimony, the verdict in this case was rendered by the jury, or permitted by the court. There was no proof of negligence by the defendant, and there was affirmative, uncontradicted, and unim-

peached testimony showing contributory negligence on the part of the deceased. Four of the plaintiff's witnesses, being all who were in the vicinity at the time of the accident, to wit, James Sell, Charles H. Miller, Daniel Leininger and Daniel Adams, testified that three whistles were blown, one long and two short, by the approaching engine, before it reached the crossing, and they were all heard by all of the witnesses. Three of these witnesses were at or near the Fritztown station, and one Daniel Adams was at the tool house along the railroad, about two hundred to three hundred yards beyond the crossing at which the accident occurred. The train was going east from Lancaster to Reading; the place of the accident was a public road crossing, situate about nine hundred and fifty feet east, or towards Reading, from the Fritztown station. The first or long whistle was blown just above a bend in the road, before reaching the Fritztown station, and the second and third were blown after turning the bend and coming within sight of a signal board at the station to denote whether the train should stop for passengers. In addition to the foregoing, another witness, Isaac Steffy, testified that he was at the tool house with Daniel Adams when the accident happened, and heard the whistle of the approaching train. He also said he had measured the distance from the crossing to the tool house and it was one thousand and thirty-four feet, so that it was an undisputed fact that notice of the approach of the train was given, in the usual way, by the sound of a steam whistle, which was loud enough to be heard a considerable distance beyond the place of the accident.

Another witness for the defendant, George Freeman, living between five hundred and six hundred yards from the Fritzown station also heard the whistle. Four witnesses for the plaintiffs, and two for the defendant, concur in their testimony that the alarm was given, and at a sufficient time before the crossing was reached, to enable a person approaching the railroad along the public road to abstain from an attempt to cross. Two witnesses, one for the plaintiff, and one for the defendant, testify that they heard the alarm at a point several hundred yards beyond the crossing. There is no opposing or contradictory testimony in the case. Facts thus established cannot be spoken of by the court or considered by the jury as disputed or controverted facts. They are entirely undisputed, proved by both sides and denied by neither. Hence the learned judge of the court below was clearly and gravely in error in leaving the question whether the whistles were sounded, to the jury, as an open and undetermined question to be decided by them, as was done in the portion of the charge covered by the fifth assignment. This error was seriously enhanced by the subsequent language of the same assignment, in which the court told the

jury that although the sound of the whistles was heard by persons beyond the place of the accident, it might be no evidence that it was heard by the person injured. Again in the same assignment the learned court propounded the case of an engineer willfully rushing upon a man whom he saw on the track before him, making no effort to stop, when he knew the man could not escape in time, as a possible answer to the proof of notice by the whistles. As there was not a particle of proof of any such state of facts in this case, such a line of remark was entirely unwarranted and was error of the gravest character. It could only serve the purpose of misleading the jury. Upon the entirely undisputed testimony it was the clear duty of the court below to charge the jury that the defendant was not guilty of negligence so far as giving notice of the approach of the train was concerned.

The only other possible basis for a charge of negligence to rest upon was the speed of the train, but here also there is an entire absence of testimony to support the charge. The train was going at the rate of twenty-five to thirty miles an hour, according to the testimony of the witnesses who spoke upon that subject. Had it been running at that rate through the streets of a town or village the question of negligence in this respect could well have been left to the jury who would no doubt have determined it against the company. But there was neither town nor village, nor any aggregation of houses, at the place of this crossing. The village of Fritztown was half a mile distant. John Sell, one of the plaintiff's witnesses, said the nearest house to the crossing was one hundred to two hundred yards away, and that the next nearest houses were two, which were three hundred yards off. He also said there was no village either at the crossing or at the Fritztown station. There was a short and shallow cut about ten or eleven feet deep at and near the crossing, on the railroad and on the public road. The railroad extended from the crossing to the station in a straight line so that a person standing on the track or within twelve or fifteen feet of the track at the crossing could see the road all the way to the station. In such circumstances it cannot be considered that a speed of twenty-five to thirty miles an hour is any evidence of negligence. The very purpose of locomotion by steam upon railways is the accomplishment of a high rate of speed in the movement of passengers and freight. It is authorized by law, and a railroad company in propelling its trains at high speed along its tracks in the open country is simply engaged in the lawful exercise of its franchise. If it is evidence of negligence that a train is run at this rate of speed, it must be because running at a less rate is a legal duty, but there is no such duty established either by statute or decision. While there may of

course, be circumstances which require a diminished speed, it is
only the force of those circumstances which creates such a duty.
None of them are here present. This train was running through
the open country, in its accustomed course, in the exercise of
the lawful powers of the company, with no dwellings or other
building in immediate proximity, neither through nor over
any municipal streets, and in observance of the law requiring
signals of its approach. In such circumstances we fail to dis-
cover any evidence of negligence in the mere fact that the rate
of speed was twenty-five to thirty miles an hour.

In addition to the foregoing consideration there was affirma-
tive and uncontradicted evidence showing that the deceased
was guilty of contributory negligence. But one witness saw
him approach the track. He saw the deceased first on the pub-
lic road at a distance of about 100 yards from the railroad mov-
ing directly towards the track and proceeding, without stopping
until the moment of the accident, when he could no longer see
him on account of the cars being higher than the wagon. He
was asked. Q. Up to the time you last saw the wagon did he
stop the team at all? A. When I did not see him any more
the not seeing him, and the crash of the accident, and the horse
running away on the other side was about one and the same
moment. Q. But during the time you saw him he did not
stop? A. No, sir.

There was not a particle of testimony in contradiction of
this, and the mere fact of the accident was so strongly in corrob-
oration of it, that it is impossible to believe that the deceased per-
formed his legal duty of stopping, looking both ways and listen-
ing for approaching trains before going upon the track. The
presumption that he did, was overcome by the opposite proof.
The court should have instructed the jury in plain and simple
words that if they believed the witness, the deceased was guilty
of contributory negligence and their verdict should be for the
defendant. In Pennsylvania R. R. Co. v. Beale, on p. 509, we
said : " But the fact of collision shows the necessity there was
of stopping, and therefore in every case of collision the rule
must be an unbending one.". . . . " There never was a more im-
portant principle settled than that the fact of the failure to stop
immediately before crossing a railroad track is not merely evi-
dence of negligence for the jury, but negligence per se and a
question for the court." In Pennsylvania R. R. Co. v. Weber,
26 P. F. S. on p. 168, Mr. Justice WILLIAMS, delivering the opin-
ion of the court said : " If as suggested in the point, the un-
contradicted evidence in the case shows that the decedent did
not stop before driving on the track, then he omitted a plain
and positive duty, and the court should have declared its omis-
sion negligence as a matter of law. But if there was no direct

[Xander *v.* Commonwealth.]

and positive evidence showing that he did not stop before driving on the track, then the learned judge was clearly right in refusing to withdraw the case from the jury and in saying as he did; ' We cannot affirm this point, but say again, that the first presumption of law is that he did stop, look and listen. But this presumption will give way to the actual truth that he did not do so.' " Of course, where there is no direct testimony on the subject the presumption is sufficient and will prevail. But where there is affirmative, direct and credible testimony that the person injured went upon the track without stopping to look and listen, the presumption is rebutted and displaced.

The learned court was also in error in saying that the rules of the company required that trains should not be run over crossings faster than at the rate of six miles an hour. That restriction applied to certain specified cuts, but not to crossings generally, and the remark would naturally tend to mislead the jury.

We think also that the seventh assignment is sustained. It must be confessed that it is not easy to understand the precise meaning of the charge, and there is in some portions of it a liability to conflicting interpretations which might confuse the mind of the ordinary juror. Upon the whole case we are clearly of opinion that the fifth point of the defendant should have been affirmed and a verdict for the defendant directed.

Judgment reversed.